```
                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
```

**Exeter Hospital, Inc.**

    **v.**                                                           Civil No. 14-cv-09-PB
                                                                 Opinion No. 2014 DNH 097

**David Kwiatkowski, et al.**


## MEMORANDUM AND ORDER

On November 18, 2013, Exeter Hospital sued the defendants in New Hampshire state court, alleging that their negligence played a role in infecting at least thirty-two patients with the Hepatitis-C virus in 2011 and 2012. The Hospital seeks indemnification and contribution for settlement payments that it paid to infected patients. The defendants removed the case to this court. The Hospital filed a motion to remand, claiming that complete diversity does not exist between the parties. The defendants objected. For the reasons set forth below, I deny the motion.

I. <u>BACKGROUND</u>[1]

David Kwiatkowski was raised in Michigan, where he received a bachelor's degree and trained as a health care worker. Doc. Nos. 1-2, 15-14. He worked at four Michigan health care facilities between 2003 and 2007. Doc. No. 15-14. Kwiatkowski left Michigan in 2007 and worked for the next four years as a traveling radiologic technician at health care facilities in New York, Pennsylvania, Maryland, Arizona, Kansas, and Georgia. Id. In 2010, co-defendant American Registry of Radiologic Technologists (ARRT) learned of allegations that Kwiatkowski had engaged in professional misconduct at a health care facility in Arizona. Doc. No. 26-1. Seeking additional information about these allegations, ARRT mailed a letter to Kwiatkowski at an address in Canton, Michigan on April 23, 2010. Id. ARRT received a reply from Kwiatkowski denying the allegations on July 2, 2010. Id.

Kwiatkowski moved to Exeter, New Hampshire in early 2011 and began working as a temporary technician at the Hospital on April 11, 2011. Doc. Nos. 15-3, 15-4. He applied for a full-time, permanent position with the Hospital on September 8, 2011

---

[1] My discussion of the facts is limited to those relevant to the determination of Kwiatkowski's domicile at the time this suit was filed.

and accepted the Hospital's offer of that position the following day.  Doc. Nos. 15-3, 15-5, 15-6.  Kwiatkowski also accepted a signing bonus that was conditioned on his remaining at the Hospital for a minimum of one year.  Doc. Nos. 15-3, 15-8, 15-9.

On October 17, 2011, Kwiatkowski began work at the Hospital as a full-time Cardiovascular Technician.  Doc. Nos. 15-3.  He informed the Hospital staff on February 20, 2012 that he intended to complete a radiation safety program by the end of the 2012 fiscal year.  Doc. Nos. 15-3, 15-12.  On at least five occasions between April 2011 and May 2012, Kwiatkowski provided written notice to the Hospital that he was residing at several different residential addresses in Exeter.  Doc. Nos. 15-3, 15-14, 15-5, 15-7, 15-10, 15-11.

This suit arises from a series of criminal offenses committed by Kwiatkowski while he was working at the Hospital between April 2011 and May 2012.  On multiple occasions, Kwiatkowski removed fentanyl-filled syringes from a secure location at the Hospital and injected himself with the drug, a highly addictive opioid.  Doc. No. 15-14.  He then used saline to refill the syringes – now contaminated with the Hepatitis-C virus that he carries – and returned them to their original locations.  Id.  When these tainted syringes were later used

3

during medical procedures, numerous patients became infected with Hepatitis-C. Id.

In May 2012, the Hospital and various governmental authorities discovered that several of the Hospital's patients had contracted Hepatitis-C. Id. When the Hospital determined that Kwiatkowski was involved, he was immediately suspended and later terminated. Doc. Nos. 1-2, 15-1. On June 11, 2012, Kwiatkowski failed to comply with a summons to appear in New Hampshire state court to respond to criminal charges related to the infections. Doc. No. 1-2. A warrant was issued for his arrest. Id. Kwiatkowski's roommate in Exeter informed investigators on June 22, 2012 that he had departed from her residence and had taken his personal belongings with him. Id. The next day, one of Kwiatkowski's family members contacted the Exeter Police Department to express concern that Kwiatkowski might be suicidal. Id.

On or about July 13, 2012, officers of the Boxborough, Massachusetts Police Department[2] located Kwiatkowski at a hotel in Boxborough, where they observed clothing and prescription bottles in his room. Id. The officers took him to a health

---

[2] The record states elsewhere that Kwiatkowski was located by the Marlborough, Massachusetts Police Department. Doc. No. 1-2. The discrepancy is immaterial.

4

care facility in Worcester, Massachusetts, where he was arrested on July 19, 2012 after police in Massachusetts discovered incriminating evidence in his car. Doc. Nos. 1-2, 15-14. On the day of Kwiatkowski's arrest, an FBI Special Agent testified that Kwiatkowski was no longer employed by the Hospital and was no longer living in Exeter. Doc. No. 1-2. She believed that Kwiatkowski had no permanent residence and had been residing in hotels since leaving Exeter. Id.

Kwiatkowski possessed a Michigan driver's license with an address in Canton, Michigan on the day he was arrested, which was two days before the license's expiration date. Doc. No. 22-1. Kwiatkowski had renewed the license at least once, in 2008. Id. Both the first expired license and the renewed license display the same address in Canton, Michigan where ARRT sent its letter to Kwiatkowski in 2010. Doc. Nos. 22-1, 26-1.

On December 3, 2012, Kwiatkowski testified in a financial declaration that he had no household expenses, had no assets aside from $0.25 cash on hand, and owed $17,800 to three lenders.[3] Doc. No. 1-6. On August 14, 2013, Kwiatkowski pled

---

[3] The handwritten names of the three lenders are illegible. See Doc. No. 1-6. In any event, the parties do not allege that the lenders' identities or locations are relevant to the domicile determination.

guilty to a number of felony counts after participating in a colloquy with the judge that included the following exchange:

> THE COURT:  All right.  Your name is David Kwiatkowski.  Tell me, where do you live?  I know you're currently detained, but where are you from?
> THE DEFENDANT:  From Canton, Michigan.
> THE COURT:  All right.  Is that where you grew up?
> THE DEFENDANT:  Yes.

Doc. No. 15-14.  On November 18, 2013, while Kwiatkowski was incarcerated awaiting sentencing in Dover, New Hampshire, the Hospital filed this suit.  Doc. No. 15-13.  Kwiatkowski was sentenced to thirty-nine years in prison on December 2, 2013. Doc. No. 1-5.  During the sentencing hearing, his attorney engaged in the following exchange with the judge:

> MR. LANGE:  Your Honor, we'd request a recommendation to the Bureau of Prisons that the defendant be designated to a facility as close as reasonably possible to Canton, Michigan.
> THE COURT:  Canton, Michigan?
> MR. LANGE:  Canton.
> THE COURT:  Is that where his family is?
> MR. LANGE:  That is where his parents live and where his brother lives.
> . . . .
> THE COURT: . . . .  It is recommended to the Bureau of Prisons that the defendant be incarcerated as close as possible to Canton, Mi[chigan].

Doc. No. 1-3; see Doc. No. 1-5.

On January 5, 2014, Kwiatkowski attested under penalty of perjury that, "[a]t the time I accepted service of the

6

lawsuit,[4] and currently, I consider the State of Michigan to be my real, true and permanent home to which I intend to return and reside indefinitely following my incarceration." Doc. No. 1-4.

## II. RELEVANT LAW

As a general principle, "an action is removable to a federal court only if it might have been brought there originally." C.A.L.L. Grp., Inc. v. Exxon Mobil Corp., 2009 DNH 124, 8 (quoting Parker v. California, No. C-98-4844 MHP, 1999 WL 111889, at *1 (N.D. Cal. Feb. 26, 1999); see Caterpillar Inc. v. Lewis, 519 U.S. 61, 68 (1996). A federal court has subject matter jurisdiction over a cause of action "only if it involves a question of federal law, or if the controversy is between citizens of different states and the amount in controversy exceeds $75,000."[5] Hall v. Curran, 599 F.3d 70, 71 (1st Cir. 2010) (per curiam) (citing 28 U.S.C. §§ 1331, 1332).

---

[4] Kwiatkowski accepted service on November 26, 2013, see Doc. No. 16-1, eight days after the complaint was filed. See Doc. No. 15-13. The parties have not alleged any facts relevant to the intervening period, during which Kwiatkowski was continuously incarcerated in the same facility in New Hampshire. See id. I find that there is no material difference between the two dates for the purpose of establishing Kwiatkowski's domicile.

[5] The parties do not dispute that this action involves an amount in controversy in excess of $75,000.

7

For purposes of diversity jurisdiction, citizenship is determined by a party's domicile at the time the suit is filed, "which can be established by demonstrating that the individual is physically present in the state and has an intent to remain indefinitely." Id. at 72 (citing Garcia Perez v. Santaella, 364 F.3d 348, 350 (1st Cir. 2004); Rodriguez-Diaz v. Sierra-Martinez, 853 F.2d 1027, 1029 (1st Cir. 1988)). The individual's intent may be proven by evidence regarding where he or she "exercises civil and political rights, pays taxes, has real and personal property, has a driver's or other license, has bank accounts, has a job or owns a business, attends church, and has club memberships." Rodríguez v. Señor Frog's de la Isla, Inc., 642 F.3d 28, 33 (1st Cir. 2011) (citing Bank One, Tex., N.A. v. Montle, 964 F.2d 48, 50 (1st Cir. 1992)). "Once challenged, the party invoking diversity jurisdiction must prove domicile by a preponderance of the evidence." Hall, 599 F.3d at 72 (quoting Garcia Perez, 364 F.3d at 350).

Ordinarily, a change of domicile merely requires "physical presence in the new state and the intent to make that state one's home." Id. (citing Rodriguez-Diaz, 853 F.2d at 1029). In the case of a party who is incarcerated, however, different rules apply. Domicile is a voluntary status determined

8

primarily by the party's intent, so a prisoner is presumed to "remain[] a citizen of the state where he was domiciled before his incarceration," regardless of where he or she is involuntarily detained.  Id. (citing Smith v. Cummings, 445 F.3d 1254, 1260 (10th Cir. 2006)); see, e.g., La Plante v. Am. Honda Motor Co., Inc., 27 F.3d 731, 742 (1st Cir. 1994) ("A person does not usually acquire a domicil of choice by his presence in a place under physical or legal compulsion." (quoting Restatement (Second) of Conflict of Laws § 17 (1971))); Stifel v. Hopkins, 477 F.2d 1116, 1121 (6th Cir. 1973) ("It [is] . . . black-letter law that a person cannot acquire a domicile of choice in a place if he is there by virtue of physical or legal compulsion.").

Nonetheless, the presumption of a continuing pre-incarceration domicile may be rebutted if "the prisoner's declaration of intentions, the possibility of parole, the manner in which he has ordered his personal and business affairs, and any other factors that are relevant to corroboration of the prisoner's statements" indicate that he or she has subsequently changed domiciles.  Hall, 599 F.3d at 72 (internal quotation marks and alterations omitted) (quoting Smith, 445 F.3d at 1260).  "No single factor is dispositive, and the analysis

9

focuses not simply on the number of contacts with the purported domicile, but also on their substantive nature." Id. (quoting Garcia Perez, 364 F.3d at 351). Mere "conclusory statements and unsupported allegations" will not overcome the presumption. Id.

### III. ANALYSIS

The Hospital argues that complete diversity is lacking because Kwiatowski, like the Hospital, was a New Hampshire citizen when this suit was filed. The Hospital bases this contention exclusively on evidence that Kwiatowski lived and worked in New Hampshire until his employment was terminated on or around June 22, 2012. According to the Hospital, the presumption of continued New Hampshire citizenship based on these undisputed facts is not overcome by Kwiatowski's affidavit identifying Michigan as his state of domicile. For the reasons set forth below, I disagree and instead conclude that Kwiatowski should be considered a citizen of Michigan for the purpose of determining whether this court has jurisdiction over the Hospital's claims.

The Hospital presents the following evidence to establish that Kwiatkowski was a New Hampshire domiciliary prior to (and presumptively after) his arrest and incarceration on July 19,

10

2012: his continuous residence and employment in New Hampshire between approximately April 2011 and June 2012; his acceptance in September 2011 of a full-time, permanent position at the Hospital along with a signing bonus conditioned on one year of continuous employment;[6] his written agreement in February 2012 to pursue a long-term professional goal related to his employment; his family member's phone call to the Exeter Police Department in June 2012;[7] and the general lack of ties or pre-incarceration statements connecting Kwiatkowski to any state other than New Hampshire.

If Kwiatkowski had been arrested while still living and working in New Hampshire, the totality of this evidence would support the Hospital's claim that he was a New Hampshire domiciliary on - and subsequent to - the date of his incarceration.  But that is not what happened.  Instead, by the time Kwiatkowski was arrested and incarcerated, all of the aforementioned connections with New Hampshire had effectively been severed.  Between May and July 2012, Kwiatkowski lost his

---

[6] The Hospital alleges that Kwiatkowski had not previously pursued or accepted permanent employment in any other state.

[7] Although the Hospital argues that this phone call supports a finding that Kwiatkowski maintained a New Hampshire domicile at all relevant times, it does little to shed light on Kwiatkowski's state of mind from the time he left New Hampshire until he was arrested in Massachusetts.

11

job in New Hampshire, left his residence in New Hampshire, took his car and personal belongings to Massachusetts,[8] and failed to respond to a summons issued by a New Hampshire state court. Given Kwiatkowski's apparent abandonment of his New Hampshire residence, the presumption that he continued to be a New Hampshire domiciliary after his incarceration carries less weight than it normally would – to the extent it is entitled to any weight at all.[9]

The weak presumption that Kwiatkowski remained a New Hampshire domiciliary at the time suit was filed is easily overcome by the most probative available evidence of his intent – Kwiatkowski's sworn affidavit stating that he "consider[ed]

---

[8] To the extent the defendants have argued that Kwiatkowski's short stint in Massachusetts is sufficient to prove that he became a Massachusetts domiciliary, those arguments are unavailing. See, e.g., Lew v. Moss, 797 F.2d 747, 752 (9th Cir. 1986) (defendant's occasional residence at a Hong Kong hotel prior to the filing of suit, absent additional evidence of intent, was insufficient to prove that he had become a Hong Kong domiciliary).

[9] Of course, an individual maintains his or her domicile until a new one is acquired, even if all ties with the former domicile have been severed. See, e.g., Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 48 (1989) ("One acquires a 'domicile of origin' at birth, and that domicile continues until a new one (a 'domicile of choice') is acquired."). But a dearth of ties to a prisoner's most recent domicile at the time he or she is incarcerated is certainly relevant when weighing the strength of the presumption at issue against the evidence necessary to rebut it.

12

the State of Michigan to be [his] real, true and permanent home to which [he] intend[s] to return and reside indefinitely following [his] incarceration." See Doc. No. 1-4; see also Hall, 599 F.3d at 72 (discussing the importance of "the prisoner's declaration of intentions" in rebutting the presumption of a continuing pre-incarceration domicile). Although the affidavit - written almost two months after the relevant date and in the context of litigation - would qualify as a "conclusory statement[] and unsupported allegation[]" absent substantial corroborating evidence, cf. Hall, 599 F.3d at 72 (rejecting prisoner's claim that he was a New York domiciliary based solely on an "unsupported statement that he had 'agreed to a civil commitment placement' in New York State after his release from custody"), the defendants here have offered substantial evidence to corroborate Kwiatkowski's declaration of intentions.

Kwiatkowski grew up, received a bachelor's degree, and was trained as a healthcare professional in Michigan. He then worked in Michigan for at least four years. When Kwiatkowski left Michigan in 2007, he kept a valid Michigan driver's license until he was arrested in 2012, renewing it on at least one

13

occasion.[10]  While Kwiatkowski was traveling around the country during this period, a professional licensing organization sought to contact him at the Michigan address listed on his driver's license; Kwiatkowski received and replied to this letter in a matter of weeks.  Three months prior to this suit being filed, Kwiatkowski informed the judge presiding over his change of plea hearing that he was from Michigan.[11]  Two weeks after this suit was filed, he asked to be incarcerated in Michigan in order to be near his parents and brother; the sentencing judge recommended that the Bureau of Prisons (BOP) comply with this request.[12]  Although neither party has presented evidence that

---

[10] The Hospital stresses that Kwiatkowski renewed his Michigan driver's license well before arriving in New Hampshire. Although true, this ignores the fact that he maintained a valid Michigan license during all relevant periods prior to his arrest.

[11] The defendants state that Kwiatkowski was served in this case about a week after his change of plea hearing, but they appear to have confused the date of that hearing with Kwiatkowski's sentencing hearing, which occurred three months later.  See Doc. Nos. 16, 22.

[12] Under the circumstances, the fact that these statements were made two weeks after this suit was filed and six days after Kwiatkowski was served does little to detract from their probative value.  Neither party alleges that Kwiatkowski's expressed desire to be incarcerated in a Michigan facility was insincere or that anything occurred during the two weeks prior to his sentencing hearing that might have affected his professed intent.  Further, it is (to say the least) doubtful that Kwiatkowski requested placement in a Michigan prison purely as a

14

Kwiatkowski exercised civil or political rights; paid taxes; possessed bank accounts, real property, businesses,[13] or licenses (other than driver's licenses); or patronized a church or club in Michigan, see Rodríguez, 642 F.3d at 33, the record is similarly silent as to whether Kwiatkowski ever did these things in any other state. In sum, Kwiatkowski retained contacts with Michigan that sufficiently corroborate his sworn statement that he considered Michigan to be his "real, true and permanent home" when this suit was filed. See id. at 32 ("[A] person's domicile is the place where he has his true, fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning." (quoting Padilla-Mangual v. Pavía Hosp., 516 F.3d 29, 31 (1st Cir. 2008))).

Contrary to the Hospital's contention, the length and nature of Kwiatkowski's sentence and the attendant lack of certainty regarding whether he will ever voluntarily settle in

---

litigation tactic. Regardless of the forum, he currently possesses less than a dollar with which to satisfy a judgment against him. See Doc. No. 1-6. It is inconceivable that Kwiatkowski would request to be placed in a state where he did not truly wish to spend the next thirty-nine years because he thought it would reduce the litigation risk to his assets.

[13] Kwiatkowski had $0.25 in assets and $17,800 in liabilities on December 3, 2012. Id. It therefore appears likely that he did not own any bank accounts, real property, or businesses at any point following his arrest on July 19, 2012 - whether in New Hampshire or elsewhere.

15

Michigan is not determinative. Cf. Smith, 445 F.3d at 1260-61 (reversing district court's domicile determination made partially on the basis of the prisoner's life sentence). In Smith, the Tenth Circuit held that if a "prisoner decides he wants to live in another state upon release and is therefore assigned to a prison in that state, his domicile becomes that state." Id. at 1260 (citing Sullivan v. Freeman, 944 F.2d 334, 337 (7th Cir. 1991)). That reasoning, adopted by the First Circuit in Hall, is true regardless of the length of sentence or the possibility of parole. It is true even if the prisoner has not yet been transferred to a facility in the state where he or she intends to live indefinitely. See, e.g., Roberts v. Wentworth Douglas Hosp., No. 09-CV-34-PB, 2009 WL 1473185, at *6 (D.N.H. May 26, 2009) (citing Smith, 445 F.3d at 1259-60) (prisoner incarcerated in New York determined to be a citizen of Maine based on evidence that he intended to take custody of his daughter in Maine upon his release). Here, the timing of Kwiatkowski's anticipated transfer is in the hands of the BOP, not Kwiatkowski, and is consequently of little relevance to the domicile determination.

Under the circumstances, Kwiatkowski's "declaration of intentions" and the "other factors that are relevant to

16

corroboration of" his statements are more than sufficient to carry the defendants' burden to demonstrate that he has changed domiciles.[14]  See Hall, 599 F.3d at 72; cf. Stifel, 477 F.2d at 1122 (illustrative indicia of a military service member's intent to establish a new domicile despite compelled presence at a duty station include affidavits, transfer requests, and motives for wishing to settle in a different state).  When Kwiatkowski is released in four decades, any remaining ties that he has with New Hampshire - or with the other states where he briefly resided over the past seven years – will most likely be a distant memory.  The connections that are more likely to endure over the years are the bonds he has formed with his family.  Those bonds strongly support Kwiatkowski's sworn declaration that he intends to live in Michigan indefinitely.  See Roberts, 2009 WL 1473185, at *6; see also Stifel, 477 F.2d at 1128 (Edwards, J., concurring) (the most obvious evidence

---

[14] Moreover, although the length of Kwiatkowski's sentence makes it somewhat more difficult to determine "the manner in which [he] has ordered his personal and business affairs" in anticipation of his eventual release, see Hall, 599 F.3d at 72 (alteration in original), "the possibility of parole" during his federal sentence is nil; thus, assuming that the BOP complies with the sentencing judge's recommendation and transfers Kwiatkowski to a Michigan facility, he will presumably remain there for at least the next four decades.  Cf. Stifel, 477 F.2d at 1127 n.7 ("The fact that [a prisoner] is serving a life sentence, of course, lends a great deal of credibility to his assertion that he will never return to [his prior residence].").

corroborating a prisoner's declaration of intentions is the permanent residence of his or her immediate family in the alleged state of domicile).

## IV.  CONCLUSION

The defendants have presented sufficient evidence to corroborate Kwiatkowski's sworn statement regarding his intent to live indefinitely in Michigan.  Because Kwiatkowski is a citizen of Michigan, this court has subject matter jurisdiction over the case.  I therefore deny Exeter Hospital's motion to remand (Doc. No. 15).

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

May 6, 2014

cc:   Robert C. Dewhirst, Esq.
      David Kwiatkowski, pro se
      Jay Surdukowski, Esq.
      Peter A. Meyer, Esq.
      Mark A. Darling, Esq.
      Mark W. Shaughnessy, Esq.
      Robert G. Whaland, Esq.
      Ralph Suozzo, Esq.
      William N. Smart, Esq.