UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Exeter Hospital, Inc.,
    Plaintiff

    v.                                      Case No. 14-cv-009-SM
                                            Opinion No. 2014 DNH 186
David Kwiatkowski; Maxim
Healthcare Services, Inc.;
The American Registry of
Radiologic Technologists;
and Triage Staffing, Inc.,
    Defendants

## O R D E R

David Kwiatkowski was a cardiac catheterization technician who, between 2003 and 2012, was employed by approximately 19 different hospitals throughout the country.  In June of 2010, he tested positive for Hepatitis C and, about one year later, in April of 2011, he began working at Exeter Hospital, in Exeter, New Hampshire.

Kwiatkowski was an intravenous drug user who often stole drugs from his hospital employers.  He injected the drugs, and covered up his conduct by refilling the used syringes with saline and returning them to the hospital's inventory.  When the tainted syringes were subsequently used, many patients were infected with the Hepatitis C virus.  At least 32 patients at Exeter Hospital were infected when they were injected with syringes tainted with

Kwiatkowski's blood.  Not surprisingly, many of those patients sued Exeter Hospital.  The hospital has settled nearly all of those suits and now seeks statutory contribution from each of the defendants named here.  In addition, it seeks contractual indemnification from Triage Staffing - the employment agency that placed Kwiatkowski at Exeter Hospital.

Pending before the court are motions to dismiss filed by Maxim Healthcare Services, Inc. ("Maxim") and The American Registry of Radiologic Technologists ("ARRT").  Each defendant asserts that the hospital's complaint fails to allege sufficient facts to demonstrate that it owed an actionable duty of care to any patient with whom the Hospital settled, or that its conduct proximately caused any patient to be infected with the Hepatitis C virus.  Exeter Hospital objects.  Also pending is Exeter Hospital's motion to stay this case, pending resolution of the few remaining state court claims brought by the hospital's former patients.  Maxim, ARRT, and Triage Staffing, Inc. have filed a joint objection.

For the reasons discussed, Maxim's Motion to Dismiss (document no. 9) is granted, ARRT's Motion to Dismiss (document no. 14) is denied, and Exeter Hospital's motion to stay (document no. 39) is denied.

**Standard of Review**

When ruling on a motion to dismiss under Fed. R. Civ. P.
12(b)(6), the court must "accept as true all well-pleaded facts
set out in the complaint and indulge all reasonable inferences in
favor of the pleader." SEC v. Tambone, 597 F.3d 436, 441 (1st
Cir. 2010).  Although the complaint need only contain "a short
and plain statement of the claim showing that the pleader is
entitled to relief," Fed. R. Civ. P. 8(a)(2), it must allege each
of the essential elements of a viable cause of action and
"contain sufficient factual matter, accepted as true, to state a
claim to relief that is plausible on its face." Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009) (citation and internal
punctuation omitted).

In other words, "a plaintiff's obligation to provide the
'grounds' of his 'entitlement to relief' requires more than
labels and conclusions, and a formulaic recitation of the
elements of a cause of action will not do." Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 555 (2007).  Instead, the facts alleged in
the complaint must, if credited as true, be sufficient to
"nudge[] [plaintiff's] claims across the line from conceivable to
plausible." Id. at 570.  If, however, the "factual allegations
in the complaint are too meager, vague, or conclusory to remove

the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Tambone, 597 F.3d at 442.

## Background

Accepting the factual allegations set forth in the amended complaint as true, the relevant background is as follows. Between 2003 and 2007, Kwiatkowski was fired by or resigned from four Michigan health facilities.  Three of those terminations/resignations came amid investigations into his unlawful use of controlled substances.  Subsequently, Maxim - a temporary hospital staffing agency - placed Kwiatkowski at the University of Pittsburgh Medical Center ("UPMC").  In 2008, UPMC terminated Kwiatkowski's employment after he was seen removing a syringe containing the drug fentanyl from an operating room and a search of his hospital locker revealed an empty syringe with traces of morphine.

According to Exeter Hospital, "Maxim was notified of the UPMC termination, but failed to report Kwiatkowski to any law enforcement agency or licensing authority."  Amended Complaint (document no. 40) at para. 45.  And, says the hospital, despite that knowledge, in November of 2008, Maxim placed him in a position at Southern Maryland Hospital.  Id. at para. 50. Finally, Exeter Hospital alleges that:

4

> Maxim's inaction [i.e., its failure to report
> Kwiatkowski to law enforcement or licensing
> authorities] enabled Kwiatkowski to remain employed as
> a traveling cardiac catheterization technician, thereby
> foreseeably placing at risk the patients at any
> hospital in the country to which Kwiatkowski might
> travel, including those at Exeter Hospital.

Id. at para. 49.  Maxim's placement of Kwiatkowski in a job at
Southern Maryland Hospital in 2008 appears to have marked the end
of its relationship with him – two and one-half years before
Kwiatkowski's placement (by a different agency) at Exeter
Hospital.

In July of 2009, Medical Solutions (not a defendant) placed
Kwiatkowski in a position at Johns Hopkins Hospital.  His
employment there ended after two incidents in which vials of
fentanyl went missing from the department in which Kwiatkowski
was working.  Subsequently, Kwiatkowski was employed at the
Arizona Heart Hospital.  He was fired in March of 2010, after he
was found semi-conscious in a restroom stall, beside a syringe
containing fentanyl.  He admitted that he had taken the syringe
and injected himself.  And, after he failed a drug test, he was
fired.  Id. at paras. 51-55.  At that point, the temporary
placement agency terminated its relationship with Kwiatkowski and
"notified defendant ARRT of the circumstances of Kwiatkowski's
termination."  Id. at para. 56.  According to Exeter Hospital:

> Although ARRT had actual notice of the Arizona Heart
> Hospital termination, ARRT took no meaningful action to
> investigate the incident and/or revoke Kwiatkowski's
> national certification.
>
> As the operator of a national registry of radiological
> technicians, ARRT had the ability to investigate,
> suspend or revoke Kwiatkowski's national certification.
>
> ARRT did not act on Arizona Heart Hospital's report of
> Kwiatkowski's misconduct, but instead, continued to
> maintain his ARRT certification.
>
> ARRT's inaction enabled Kwiatkowski to remain employed
> as a traveling cardiac catheterization technician,
> thereby foreseeably placing at risk the patients at any
> hospital in the country to which Kwiatkowski might
> travel, including those at Exeter Hospital.

Id. at paras. 57-60.


As noted earlier, Kwiatkowski tested positive for Hepatitis
C in June of 2010.  Id. at para. 36.  He began working at Exeter
Hospital in April of 2011 and, approximately one year later, the
hospital became aware that three of its former patients had been
diagnosed with Hepatitis C.  Testing revealed that all three
former patients had been infected with an identical strain of
Hepatitis C, which suggested a common source of infection.  The
hospital later determined that Kwiatkowski was infected with the
same strain of Hepatitis C and it identified him as the potential
source of patient infections.  He was immediately placed on leave
and later fired.  More than 3,000 patients of Exeter Hospital
were tested for the virus.  Thirty-two former patients tested

positive for the same strain of Hepatitis C associated with
Kwiatkowski.

     In July of 2012, Kwiatkowski was arrested and charged with
multiple violations of federal law.  He pled guilty to all
charges and was sentenced to serve 468 months (39 years) in
prison.

     Between December of 2012 and May of 2014, Exeter Hospital
settled numerous civil claims filed against it by former patients
who had been infected by Kwiatkowski.  As part of each
settlement, the hospital obtained "a general release of all
claims which discharged the common liability of Exeter Hospital,
Kwiatkowski, Maxim, ARRT, AHSA, and Triage."  Amended Complaint
at para. 97.  It appears (though it is not entirely clear) that
none of those defendants contributed to the settlements.[1]

     The hospital alleges that the amount it paid to settle those
claims and discharge the common liability of the non-contributing
defendants, while reasonable, was "disproportionate to its actual

---

     [1]    It is possible that Triage and AHSA may have
contributed to a few, but not all, of the settlements.  Compare
Amended Complaint at paras. 97-100 (not including Triage or AHSA
in the list of non-contributing defendants) with id. at paras.
147-48 (specifically identifying Triage and AHSA as having failed
to contribute to a particular settlement).

responsibility for the Hepatitis-C outbreak." Amended Complaint at para. 149. Accordingly, it seeks to have the "proportionate fault of the non-contributing defendants established, and to be awarded statutory contribution from each non-contributing defendant in an amount that is commensurate with that apportionment." Id. at para. 150.

Defendants Maxim and ARRT deny that they owed the hospital's patients any actionable duty to warn them of the potential risk posed by Kwiatkowski, or to report Kwiatkowski's conduct to law enforcement or licensing authorities. They also deny that their conduct proximately caused any patients at Exeter Hospital to become infected by Kwiatkowski.

## Discussion

I.   Statutory Contribution.

Under New Hampshire's statutory contribution scheme, "the jury, or if there is no jury [the court,] shall find the amount of damages to be awarded to each claimant and against each defendant in accordance with the proportionate fault of each of the parties." N.H. Rev. Stat. Ann. ("RSA") 507:7-e. A defendant who has settled with a claimant, may recover against another tortfeasor only if "the settlement extinguishes the liability of the person from whom contribution is sought, and then only to the

extent that the amount paid in settlement was reasonable."  RSA
5-7:7-f.  As the New Hampshire Supreme Court has observed, one of
the purposes of that statutory scheme is "to relieve defendants
involved in personal injury lawsuits from damages exceeding their
percentage of actual fault."  Ocasio v. Fed. Express Corp., 162
N.H. 436, 446 (2011).

    Here, the hospital's claims for contribution rest on its
assertion that defendants' negligence proximately caused the
patients with whom the hospital settled to contract Hepatitis C.
So, to prevail on those contribution claims, the hospital must
demonstrate that each individual defendant owed a duty to the
infected patient, it breached that duty, and that breach
proximately caused the patient's injury.  See Pesaturo v. Kinne,
161 N.H. 550, 557 (2011).  Whether a duty exists in a particular
case is a question of law.  See Carignan v. N.H. Int'l Speedway,
Inc., 151 N.H. 409, 412 (2004).  And, "[a]bsent the existence of
a duty, a defendant cannot be liable for negligence."  Id.

    As to each of the named defendants - including Maxim and
ARRT - Exeter Hospital alleges the following:

    Prior to the time that Kwiatkowski arrived at Exeter
    Hospital, each of the defendants knew, or through the
    exercise of reasonable care, should have known, that
    allowing Kwiatkowski to continue working as a traveling
    cardiac catheterization technician would foreseeably

place at extreme risk any patient who came under his care.

Each of the defendants owed a duty to exercise reasonable care to properly screen, test, monitor and supervise Kwiatkowski in his capacity as a traveling cardiac catheterization technician.

Each of the defendants owed a duty to exercise reasonable care to fully investigate and report to the appropriate authorities Kwiatkowski's illegal drug diversion and use.

Each of the defendants owed a duty to immediately and permanently prevent Kwiatkowski from continuing his employment as a traveling cardiac catheterization technician.

Amended Complaint at paras. 82-85.  According to the hospital, each of the defendants breached one or more of those duties. And, says the hospital, as a "direct and proximate result of the aforesaid breaches of duty by each of the defendants, Exeter Hospital and its patients were foreseeably harmed within the State of New Hampshire."  Id. at para. 90.


II.  Maxim Healthcare Service, Inc.

According to the hospital, the duty Maxim breached was its obligation to report "to appropriate authorities" UPMC's dismissal of Kwiatkowski in 2008 and, thereafter, to "immediately and permanently prevent Kwiatkowski from continuing his employment as a traveling cardiac catheterization technician." See Amended Complaint at paras. 84-85.

At this juncture, it probably bears noting what the hospital's amended complaint does <u>not</u> allege with regard to Maxim.  First, the hospital does not claim that Maxim knew UPMC fired Kwiatkowski for stealing controlled substances, using hospital hypodermic needles, and/or engaging in illegal drug use. Nor does the amended complaint allege that Maxim knew (or should have known) that Kwiatkowski was infected with Hepatitis C.  The amended complaint simply alleges that Maxim was aware of the fact of - but not the circumstances surrounding - Kwiatkowski's discharge from UPMC.  <u>See</u> <u>Id.</u> at para. 46 ("Maxim was notified of the UPMC termination, but failed to report Kwiatkowski to any law enforcement agency or licensing authority.").

Nevertheless, the hospital seems to imply that Maxim had knowledge beyond that which is specifically alleged in the amended complaint.  After noting that Maxim did not notify any licensing or law enforcement agencies of Kwiatkowski's termination from UPMC in 2008, the amended complaint alleges:

> Recognizing the obvious importance of making such a report, Maxim created and back-dated an e-mail message suggesting that it had reported Kwiatkowski's conduct to the Maryland Board of Physicians in 2009.

> Maxim subsequently admitted (through counsel) to the Maryland Attorney General's Office that the e-mail message was a fabrication.

Amended Complaint at paras. 47-48.  The hospital has not, however, appended that e-mail to the amended complaint, nor has it disclosed its contents, nor does the hospital state when it was actually generated.  The amended complaint simply references that document without elaboration.

Even if the hospital had disclosed the contents of that document, however, it is difficult to see how it might be relevant to this case.  The mere existence of such a document does not shed light on what Maxim actually knew in 2008.  That Maxim may have thought - perhaps several years after the fact - that it should have reported UPMC's termination of Kwiatkowski to the Maryland Board of Physicians, reveals nothing about what it knew (or should have known) in 2008 - the date on which the hospital claims Maxim breached its common law duty.[2]

_____

[2]     In its Reply Memorandum (document no. 25), Maxim suggests why the hospital's amended complaint is (seemingly purposefully) vague in alleging what Maxim knew about the circumstances surrounding UPMC's termination of Kwiatkowski's employment.  See Id. at 2-3 ("The Complaint accurately states Maxim was aware of Mr. Kwiatkowski's dismissal by UPMC, but Exeter Hospital cautiously does not go further - perhaps because voluminous discovery obtained from UPMC and Maxim which Exeter Hospital has possessed for nearly a year has demonstrated no such 'smoking guns' such as Maxim's awareness of a positive drug screen or results of a UPMC test showing that a syringe had been refilled with another liquid which might indicate it had been swapped after use.").

Given the allegations in the amended complaint, it cannot be said that Maxim should have (or could have) foreseen the criminal conduct in which Kwiatkowski engaged while employed at Exeter Hospital, or the injuries he inflicted upon the hospital's patients.  Mere knowledge that he had been fired from his position at UPMC, without more, is insufficient to impose upon Maxim the duties the hospital says were breached.  See generally England v. Brianas, __ N.H. __, 2014 WL 2749153 (N.H. June 18, 2014) (discussing the concepts of "duty" and "foreseeability" under New Hampshire law, and the limited exceptions to the general rule that individuals have no duty to protect others from the criminal conduct of third parties).  And, of course, Maxim did not place Kwiatkowski at Exeter Hospital.

Based upon the facts allegedly known by Maxim in 2008, it could not reasonably foresee that Kwiatkowski would infect (or otherwise harm) patients at Exeter Hospital.  Consequently, Maxim had no duty to report Kwiatkowski's discharge to licensing or law enforcement agencies.  As the New Hampshire Supreme Court has noted,

> In determining whether a duty exists, we recognize that no negligent act threatens all imaginable harms; unreasonably dangerous conduct is dangerous because it threatens particular kinds of harms to particular kinds of persons in particular ways; responsibility should follow the pattern of the risk.  Accordingly, "[t]he risk reasonably to be perceived defines the duty to be

obeyed." <u>Palsgraf v. Long Island R. Co.</u>, 248 N.Y. 339,
162 N.E. 99, 100 (N.Y. 1928).  The scope of the duty,
therefore, is limited to those risks that are
reasonably foreseeable.

<u>Macie v. Helms</u>, 156 N.H. 222, 224-25 (2007) (citations and

internal punctuation omitted).  <u>See also</u> <u>Corso v. Merrill</u>, 119

N.H. 647, 651 (1979) ("The key to applying a traditional

negligence approach is the doctrine of foreseeability.  Duty and

foreseeability are inextricably bound together. . . . A person

may be liable only to those who are foreseeably endangered by his

conduct and only with respect to those risks or hazards whose

likelihood made the conduct unreasonably dangerous.  His duty is

measured by the scope of the risk which negligent conduct

foreseeably entails.") (citations and internal punctuation

omitted).

Moreover, under New Hampshire's common law of negligence, an

individual or entity does not typically owe a duty to protect

others from the criminal conduct of a third party (like that in

which Kwiatkowski engaged).  <u>See, e.g.</u>, <u>Brianas</u>, 2014 WL 2749153,

*2 ("Private persons have no general duty to protect others from

the criminal acts of third persons.  This rule is grounded in the

fundamental unfairness of holding private citizens responsible

for unanticipated criminal acts of third parties.") (quoting

<u>Walls v. Oxford Mngt Co.</u>, 137 N.H. 653, 656-56 (1993)).  <u>See also</u>

14

Remsburg v. Docusearch, Inc., 149 N.H. 148, 153-54 (2003)
(citations and internal punctuation omitted).  And, the amended
complaint fails to allege sufficient facts to support application
of any of the four (rarely) invoked exceptions to that rule.  See
generally Brianas, 2014 WL 2749153, *2; Walls, 137 N.H. at 657-
59.


III.  The American Registry of Radiologic Technologists.

     The potential tort liability of ARRT presents a closer
question because, as a certifying agency, it may have assumed a
broader range of duties than those imposed upon a temporary job-
placement agency like Maxim.  Moreover, ARRT is alleged to have
had substantially greater knowledge of Kwiatkowski's misdeeds.
Specifically, the amended complaint alleges that, in March of
2010, Kwiatkowski was fired from his job at the Arizona Heart
Hospital after he was found "semi-conscious in a restroom stall
[and] [t]he co-employee who discovered him observed a fentanyl
syringe floating in the toilet," id. at para. 52, and that
Kwiatkowski subsequently failed a drug test.  The amended
complaint goes on to allege that:

          The temporary medical staffing agency that had placed
          Kwiatkowski at Arizona Heart Hospital, Springboard,
          Inc., also terminated Kwiatkowski's employment, and
          notified defendant ARRT of the circumstances of
          Kwiatkowski's termination.

> Although ARRT had actual notice of the Arizona Heart
> Hospital termination, ARRT took no meaningful action to
> investigate the incident and/or revoke Kwiatkowski's
> national certification.

Id. at paras. 56-57.  The amended complaint concludes that,
"ARRT's inaction enabled Kwiatkowski to remain employed as a
traveling cardiac catheterization technician, thereby foreseeably
placing at risk the patients at any hospital in the country to
which Kwiatkowski might travel, including those at Exeter
Hospital."  Id. at para. 60.


     Accepting the factual allegations in the amended complaint
as true, ARRT knew that Kwiatkowski was found semi-conscious, at
his place of employment, having injected himself with fentanyl -
a controlled substance he likely misappropriated from his
hospital employer.  ARRT also knew that Kwiatkowski failed a drug
test and was fired by both the hospital and the temporary
placement agency.  Those facts necessarily gave rise to at least
two critical questions.  First, what reasonably foreseeable risks
did Kwiatkowski pose to patients of hospitals in which he might
work?  And, second, what (if any) duty did ARRT have with respect
to that patient population?


     While ARRT plainly thinks those questions should be resolved
as a matter of law in its favor based upon the sparse facts

alleged in the amended complaint, the court disagrees.  Indeed,
the substantial volume of material outside the amended complaint
submitted by ARRT and Exeter Hospital suggests that this case may
turn on material facts not fully developed in that pleading.
See, e.g., Exeter Hospital's Objection to ARRT's Motion to
Dismiss (document no. 20) (attaching ARRT's answers to
interrogatories, deposition testimony, and copies of earlier
state court decisions in this matter); ARRT's Reply Memorandum
(document no. 26) (attaching deposition testimony and various
correspondences about the incident at Arizona Heart Hospital).[3]

As an aside, the court notes that ARRT's public website
suggests that it may have undertaken a duty to investigate the
incident at Arizona Heart Hospital and/or take action to revoke
Kwiatkowski's certification credentials - particularly since ARRT
apparently seeks to induce a national audience of potential
medical employers to rely upon its certification credentials as
an indication that ARRT has carefully reviewed applicants and

---

[3]     At this juncture, the court need not determine which,
if any, of those documents might properly be considered in ruling
upon ARRT's motion to dismiss.  See generally Watterson v. Page,
987 F.2d 1, 3 (1st Cir. 1993) (noting that when ruling on a
motion to dismiss, courts may consider "documents the
authenticity of which [is] not disputed by the parties; . . .
official public records; . . . documents central to plaintiffs'
claim; or . . . documents sufficiently referred to in the
complaint.").  See also Schaefer v. IndyMac Mortg. Servs., 731
F.3d 98, 100 n.1 (1st Cir. 2013).

determined that its certificate holders are professionally competent, capable, and ethical, and that it investigates matters of potential disqualification to assure continuing eligibility for certification.  That website provides, in part, as follows:

> **ARRT CERTIFICATION.**  Certification is the initial recognition of an individual who satisfies certain standards within a profession.  <u>Employers, state licensing agencies, and federal regulators look at the ARRT credential as an indication that a person has met a recognized national standard for medical imaging, interventional procedures, and radiation therapy professionals</u>.
>
> As outlined in ARRT's "Equation for Excellence," candidates for ARRT certification <u>must meet basic education, ethics, and examination requirements to become eligible</u>.
>
> * * *
>
> **Ethics Requirements for ARRT Certification.**  Every candidate for certification must, according to ARRT governing documents, "be <u>a person of good moral character and must not have engaged in conduct that is inconsistent with the ARRT Rules of Ethics</u>," and they must "agree to comply with the ARRT Rules and Regulations and the ARRT Standards of Ethics."  <u>ARRT investigates all potential violations in order to determine eligibility</u>.

The American Registry of Radiologic Technologists, https://www.arrt.org/Certification (visited August 28, 2014) (emphasis supplied).[4]

---

[4]      Although ARRT's website is not discussed in the amended complaint, it is referenced in the supplemental materials submitted by Exeter Hospital and ARRT.  Additionally, ARRT's certification standards are discussed in an earlier state court decision issued in this case, which was also submitted by Exeter

The dispositive point here is that the amended complaint, as drafted, passes muster in that it outlines, in brief, a plausible legal and factual claim against ARRT.  Disposition of that claim may require a trial or it may be amenable to resolution as a matter of law - but on summary judgment.  It remains unclear at this point whether material facts are in dispute.

IV.  <u>Exeter Hospital's Motion to Stay</u>.

Finally, Exeter Hospital moves the court to stay this contribution action, pending resolution of the last few state court cases filed by the hospital's former patients.  According to the hospital,

> Only six of the twenty-nine cases originally brought by
> Kwiatkowski victims remain pending.  The rest have been
> successfully mediated.  Two of the remaining six suits
> are scheduled for mediation in the next thirty days.
> The Superior Court has issued a series of procedural
> orders, and anticipates conducting the trials of any
> cases that have not settled starting in January 2015.

Motion to Stay (document no. 39-1) at 4.  Invoking the <u>Colorado River</u> abstention doctrine, <u>see</u> <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800 (1976), the hospital asserts that this court should "stay these proceedings and abstain from ruling on the pending motions to dismiss."  <u>Id.</u> at 6.  The court disagrees.

───────────

Hospital in opposition to ARRT's motion to dismiss.

19

As the court of appeals for this circuit has noted, "The crevice in federal jurisdiction that Colorado River carved is a narrow one.  Of all the abstention doctrines, it is to be approached with the most caution, with only the clearest of justifications warranting dismissal."  Jimenez v. Rodriguez-Pagan, 597 F.3d 18, 27 (1st Cir. 2010) (citation and internal punctuation omitted).  The court went on to note that, "Unsurprisingly, the cases that satisfy this test are few and far between."  Id. at 28.  Exeter Hospital has not shown that this is one of those rare and exceptional cases.  Nor has it shown any benefit to be gained by staying these proceedings at this time.  Should it subsequently become necessary to issue a stay so the full extent of the hospital's damages liability to its former patients can be determined, the court will entertain the appropriate motion at that time.  But, resolution of the underlying liability issues need not be delayed.

### Conclusion

For the foregoing reasons, as well as those set forth in Maxim's memoranda, Exeter Hospital's amended complaint fails to state any viable claims against Maxim.  According, Maxim's motion to dismiss (document no. 9) is granted.  The motion to dismiss filed by The American Registry of Radiologic Technologists

20

(document no. 14) is, however, denied.  Exeter Hospital's motion
to stay (document no. 39) is also denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 4, 2014

cc:  Mark A. Darling, Esq.
     Robert C. Dewhirst, Esq.
     David Kwiatkowski, pro se
     Jonathan A. Lax, Esq.
     Peter A. Meyer, Esq.
     Elaine M. Michaud, Esq.
     Peter W. Mosseau, Esq.
     Nicole Paquin, Esq.
     Mark W. Shaughnessy, Esq.
     William N. Smart, Esq.
     Ralph Suozzo, Esq.
     Jay Surdukowski, Esq.
     Robert G. Whaland, Esq.